Welcome to the Fifth Circuit. This is the second day of oral arguments for this panel. We have two cases to hear today. Counsel, if you have argued with us before, you know about our lighting system. If you have not, the green light, please be cognizant. The green light means you have plenty of time. The yellow light means your time is running out. You have less than two minutes. And of course, when the red light goes on, we ask you to complete your sentence and be seated so that we can get to the next argument. The first case we have today is United States v. Glover-Wing, number 2430431. We will first hear from Mr. Aberle. Did I pronounce that correctly? It's Aberle. Aberle, okay. When I hear Aberle so much, I sometimes forget. Okay. All right. Well, thank you, sir. You may begin. Okay. Yes, Mr. Aberle, court appointed for Ms. Glover-Wing. I'd like to start with a discussion of the sufficiency of the evidence on the four counts of conviction, and I'd like to begin with the three substitute counts. Each of those involved a particular patient that was certified for hospice care. Each patient actually suffered from the conditions from which Medicare was billed. Each one received the services for which Medicare was billed. The question, the governing theory of fraud was that these certifications were not justified, that although they were sick, they were not hospice eligible. And because that is the nature of the fraud, it is our position that in order to convict her of fraud, you have to find that the certifications themselves were false. And as the government itself stated during the trial, she can't do without the doctors. And with respect to these three patients, all of them were certified by no less than two doctors. By way of example, Cynthia Alexander, she was Dr. Wilson's patient for many, many years. She was suffering from a number of things, including lupus, and when her weight went from 271 pounds to 105, Dr. Wilk certified her for hospice care. Several months before that, another doctor, unrelated to the defendants in this case, or unrelated to angel health care, also certified, or also diagnosed her as having end-stage lupus. During her stay, I believe it was maybe seven months, I'm not sure, she suddenly became very responsive to the steroid treatment. And as a consequence, Dr. Wilk removed her from hospice. And in fact, well, the government argues that, points to three things that suggest that that certification was false. First, Ms. Lawrence Alexander did in fact testify at trial. She obviously did not die. Second, there was a rheumatologist who opined that her, who examined her in the first instance after her recovery, that she, that her lupus was stable. And then there was a third, the third thing they point to was the doctor to whom Dr. Wilk referred Ms. Alexander, who was of the opinion that she never did suffer from an end-stage lupus. The first two considerations are of no note. It's understood that she had a big turnaround, as she called it herself, it was a miracle. So the fact that she testified, and the fact that a doctor examined her in the first instance, you know, after the fact, doesn't answer the question whether the initial certification was fraudulent. As to the third rheumatologist, that doctor said that she didn't think Ms. Alexander was end-stage, but she agreed that she was, that her lupus was uncontrolled, and she said she would not be terribly surprised if she had actually died during hospice. So what, basically what that particular account boils down to is a disagreement between doctors. In fact, it's two to one in doctors against finding fraudulent certification. So if you can't find the certification for fraud, you can't find that she was fraudulent either. And that's our position with respect to that patient, as well as the other two patients. You have Mrs. Arcemont. Ms. Arcemont was certified by her own private doctor as being hospice-eligible, but the doctor explained that the doctor thought she was certifying her for palliative care based on what the doctor said was an ambiguity in the form. Nevertheless, during her three months in hospice, three other doctors certified and recertified her for hospice before changing their mind and deciding that she, you know, she was not hospice-eligible. And then the last one is Laura Cooper. Laura Cooper was diagnosed as having end-stage COPD by both Drs. Lewis and Dr. Wells. And after five months, they reconsidered that diagnosis and discharged her. Now, it's noteworthy that although she didn't die within six months, which is, you know, the expected time that you have when you're admitted to hospice, she did die of respiratory failure in two weeks. So basically, the bottom line is that the government failed to prove that any of the certifications were fraudulent. Of course, the jury found the same thing by acquitting the doctors of all counts, and therefore you can't find Ms. Gobley guilty on those substantive counts, which brings us to the conspiracy. We see that the government suffers, well, has three hurdles to clear to prove conspiracy in this case. And we would argue they didn't need any of them. The first one concerns the fact that the, you know, the fraud, as I mentioned earlier, relates to the certifications. This isn't a case where she's charged with billing for things that never happen or making up diseases or making up patients. So, again, it all boils down to certifications. So if you don't, can't show a fraudulent certification, you can't show that she's committed a conspiracy. Counsel, why should we not follow our line of cases that state explicitly that even if all co-conspirators are found not guilty, we shouldn't disturb a finding of guilt of a single defendant? Well, to the extent that rule says that an acquittal on some defendants has no, is not dispositive of the evidence against any other defendant, I mean, our argument is simply that in this case, the jury convicted without sufficient evidence. So, I mean, ours is a straight-up sufficiency claim. We don't, we're not arguing, as it has been suggested, that we were dealing with inconsistent verdicts or, you know, or some sort of, you know, res judicata based on these other convictions. But those convictions, those acquittals, nonetheless, are, we would argue, are illustrative of the lack of evidence in this case. And although, you know, it's also noteworthy that the jury not only acquitted the doctors, the jury revealed in its question to the court that it found, as a matter of fact, that Ms. Ludewig did not conspire with those doctors, hence the question, can we find her guilty of conspiracy? Well, could it be, you used the term acquitted, the jury verdict form, I assume, says guilty or not guilty, is that correct? Could it be that the jury found the government had not proven beyond a reasonable doubt that the others committed a conspiracy, a criminal offense in the nature of a conspiracy? In other words, there was some evidence of it, but not sufficient to go beyond a reasonable doubt as to those defendants. Why should we not look at the case that way, the verdict that way? Well, how you should look at it is that, you know, there wasn't, if there wasn't sufficient evidence, which the jury found, but we're arguing it's independent, of fraudulent certifications, then you can't convict her of conspiracy because then these patients were not fraudulently, they weren't billed through fraud, Medicare was not billed through fraud. That's our position on that. But we think the second hurdle that the government faces is what they point to as fraudulent behavior is, we would argue, is ambiguous at best. For example, giving bonuses to the doctors. You know, is that conspiring to bring in ineligible patients or is it aggressive marketing? Or using the word, don't use the word hospice when you sign up a patient. Is that, is that Ms. Glugwing trying to trick these patients into, you know, into hospice when they're not eligible? Or is it a delicate way of, you know, getting them hospice care without reminding them that they're about to die? You also have the other thing the government points to is nurses charting, Ms. Glugwing instructs them to chart only on the worst day, you know, chart the bad stuff. And the two witnesses who testified to that, both of them said, well, this is a perfectly appropriate means of charting. You know, to not do that may ultimately misrepresent the seriousness of their conditions. And they give examples for that. And then perhaps the most, the most troublesome one is Ms. Glugwing instructing a nurse to backdate the hospice date of admissions. It's not clear, it seems what the evidence on that is, if a patient's in the hospital, they're not supposed to be in hospice care. So if they come out of the hospital on day one and they don't get back until day three, she would say backdate the admission to day one. Now, whether that, whether that ever ended up as a, you know, as a material misrepresentation, I don't think the evidence was there. But that brings me to the third problem, the third hurdle that the government, we believe, hasn't met. And that is, she still needs someone to conspire with. The very nurse who said, you know, she told me to backdate these admissions, well, she quit for that reason. And every witness that testified to what they believe was improper goings-on at angel care, none of them, they all disagreed with it. They either quit or they refused to do it. So you need to have a, you need to have someone that you can conspire with. And we don't think they came up with that either. Now, if the court disagrees with that, we have to move on to the second issue, which is the judicial establishment, which our position is that the government was stopped from obtaining a conspiracy conviction. The premise is not an agreement between Ms. Loveling and any of her staff, because the government represented before and during trial several times that there were no unindicted co-conspirators. Do we have any other circuit cases that recognize judicial estoppel in a criminal case? Well, this court has addressed it many times, but only for the caveat that, you know, we've never addressed it before, and we'll just assume for argument that it applies. But, you know, it was certainly applied in Zedner, which is a U.S. Supreme Court case. So, you know, and there are cases in other circuits that have applied it, which is different from saying there are any cases where a defendant has succeeded in that claim. We're hoping that if need be, that this is the one, given the representations made to the defendants. And, you know, our position is that they were reasonable in relying on that and acting the way they did by altering their defense, specifically by not cross-examining the staff or making argument during closing that's directed at negating the existence of the conspiracy. And that's my argument, if there's no questions. Okay. All right. Thank you, sir. Thank you. We will, you have four minutes for rebuttal. We'll hear from Mr. Rotker now on behalf of the government. Thank you, Your Honor, and yes, you did get my name correctly, so you're one out of two. So that's a pretty good batting average. May it please the court, please say good morning. Good afternoon. Michael Rotker from the Department of Justice on behalf of the United States. Unless the court would like me to proceed in a different order, I'm just going to pick up where you ended. Whichever, however you wish. Sure. So on the question of judicial estoppel, just a couple of points. Your Honor asked my opponent whether or not it's ever been applied in a criminal case. The answer is yes, in Zedner. The issue here, though, is not whether it's ever been applied in a criminal case. It's whether it's ever been applied against the government in a criminal case. In Zedner, the government was trying to stop the criminal defendant. That's not the situation we have here. As to that question, which is the salient one, we are not aware of any case from this court, of course, has reserved it. The First Circuit has reserved it, and I'm not aware of any circuit that has applied it against the government. That being said, this is, I think, with all respect, a very easy case for the court to simply assume an arguendo and then find that there is no basis for applying judicial estoppel. And the bottom line reason is, I think, very clear, which is if the district court had granted the estoppel that Ms. Glover-Wayne sought, we would be in the exact same position that we are right now. And if the court will just indulge me for a minute, what I'd like to do is just walk through the sequence of events, beginning with the jury notes, and explain what I mean by that conclusion. The jury's notes said, can we convict her for conspiring with people other than doctors, in other words, with her employees? In response to that note, the district court, on its own initiative, convened the parties and said, I'm going to give the jury an instruction that they can, because the indictment had an other's unknown clause in it. So the indictment was brought off. The defense responds by saying, well, wait a minute. The government previously made this representation that there are no unindicted co-conspirators, and therefore the government should be estopped. The government then said, well, wait a second. Yeah, there was a prior discussion at this pretrial status conference, but that had nothing to do with the scope of the indictment. What we were talking about there were the rules of evidence, and specifically whether the co-conspirator exception to the hearsay rule applied. It's apples and oranges. Whatever we said about the co-conspirator exception, we did nothing to limit the scope of the indictment. And the district court said, you know what? There's no transcript of that pretrial conference, but I'm going to take a break. I'm going to go back and look at my notes, and then I'll come back and issue a ruling. The court comes back, and then it makes a finding on the record, which is transcribed and is part of the record on appeal, and the district court says the government did make a representation that there were no unindicted co-conspirators, but that representation was specifically limited to the rules of evidence. There was never any challenge to the indictment. There was no discussion. So the government didn't limit itself in any way, shape, or form. Did the government, in closing arguments or at any point, argue that the conspiracy included employees and others that were not part of the indictment? So it's a close question. Here's the way I would say, Your Honor. In closing argument, the theme of the trial, and I think the defense would agree, this was all about Glover Wing and the doctors. In our closing argument, though, there were discussions. The government made a couple of references to the fact that Glover Wing's employees were kind of necessary to the scheme, but it wasn't really a kind of full-throated suggestion that they were themselves co-conspirators, and that's exactly why, because that's why the evidentiary ruling, we didn't rely on it. We didn't think we could prove they were co-conspirators. So after the district court makes its ruling, this is the critical fact. Even though the district court was prepared to give this supplemental instruction, the court heard further from the parties, and then it put the brakes on its own proposal, and it said, you know what, I've changed my mind. I'm not going to give a supplemental instruction. I'm just going to read the jury the unobjected-to instruction I already gave them that defines a conspiracy, and the government at that point, and this is really where the rubber hits the road, the government didn't say, Your Honor, please give that instruction. Please give the supplemental instruction. We said, no, we agree with you, Judge. This is the safest course. There's no need to give a supplemental instruction. Just reread. So what the defense is arguing is that the government should have been estopped from taking that preliminary response to the court's proposed supplemental instruction when it never gave the supplemental instruction. There's nothing to have estopped, and that's why I say if the court had granted the estoppel, let's assume the court had agreed and said, Yeah, the government's estopped. We'd still end up in the same place because the court never gave the supplemental instruction. So there's the estoppel issue, I think, with all respect. It's kind of there's no there there. Even putting aside the apples and oranges that we're talking about two different things, there's just nothing to estop because of the way the district court ultimately ruled on the issue. There was no supplemental instruction that was ever given. There was nothing to estop. The one other just brief point that I want to make about the estoppel, this is just in the sort of bigger picture interest. In a footnote in our brief, we did note that one of the requirements for judicial estoppel that the Supreme Court established is that there has to be proof that the district court adopted the government's position. There is an old Fifth Circuit case called McCleskey that is cited in that footnote in our brief. In that case, that predates the Supreme Court's decision in New Hampshire versus Maine. In McCleskey, the court did not say that there has to be, the district court actually has to find. It simply said that a party cannot change a position that it previously advocated. But it doesn't say anything about reliance. And both the Supreme Court's later decision in Maine versus New Hampshire and this court's in Maine decision in Reed versus Arlington make clear that there does have to be a reliance. The district court has to actually adopt the position before you can apply judicial estoppel. The court may just wish to clarify that that statement in McCleskey to the extent it suggests the district court doesn't have to adopt the position, that that's no longer the correct statement of law in light of subsequent precedent. And so we think there's simply no basis for the court to apply judicial estoppel. Unless the court has further questions for me on that issue, I'd like to just briefly turn to the sufficiency point. On the sufficiency point, there's some logic, of course, to the idea of this defendant not being a doctor relied upon certifications of those who are trained to give them. Absolutely. And accepted these patients based upon that reliance, which may have turned out incorrect, to be incorrect. What other evidence did the government adduce at trial to show intent on the part of this defendant to commit a fraud and to conspire to commit a fraud? Yes, absolutely. And I'm happy to walk through that. In our view, there are sort of four buckets of evidence that were presented that bear on knowledge and intent to defraud. And let me walk you through those four. The first is just the nature of the conspiratorial scheme, the pay to play arrangements, the willingness of Glover Wing to pay bonuses, census bonuses. And the more beds that are filled, the more of the doctor's going to be enriched. There was also specific testimony that she entered into a medical directorship agreement with another doctor who would not participate in referring patients to her hospice. And she immediately cut ties with him because he didn't want to play, if you will. So first bucket of evidence. Second bucket of evidence is what I'll call the false charting evidence. And that was briefly referred to by my opposing counsel. But basically, there's two strands or two components to that bucket. The first is the fact that she specifically instructed several of her nurses to only chart the patients on their worst day, to ignore the evidence that was good, to sort of present a distorted portrayal of these patients' medical conditions. And the other half of the false charting was this use of end stage as a descriptor for these patients' conditions. And there are two problems with the end stage evidence that's relevant in two different respects. First of all, some of the patients' charts didn't even support, as a matter of their pathology, that they had an end stage condition. And the other half of it is that, at least with respect to the three patients who were charged on the substantive counts, their diagnosis, there's no such thing as end stage. So what do I mean by that? Well, one of the patients was diagnosed with lupus. One was diagnosed with spinal stenosis, a lumbar condition. And one was diagnosed with COPD, a lung disease. But there was testimony that, while some conditions, like cancer and other things, can have advanced stage or end stage conditions, lupus and COPD and stenosis don't even have end stage. Again, the fact that she's telling people to use a descriptor of end stage that is just not medically appropriate is certainly relevant evidence trying to make these patients perhaps appear worse than they were. My third bucket, or the third bucket of evidence, Your Honor, is, I think, perhaps, Your Honors, is perhaps the most significant. And that's what I'll call the fact that she sort of turned a blind eye to the red flag evidence. There was evidence presented where Glover Wing was told by her employees and by her staff about irregularities, about the fact that a patient who was being treated for hospice for cancer, that during a chart review, they found out, oh, what do you know? The cancer's been removed. Now, for people that are certified Medicare providers, as the court well knows, they rely upon the integrity and the honesty of these providers to be truthful. If someone comes to a certified Medicare provider and says, you're treating someone for cancer, but the cancer's been removed, I think one would hope and expect that the provider would step back and say, wait a minute. We need to stop billing. We need to look into this. We need to investigate before we continue because there may be something wrong here. What does Glover Wing do? She says, don't worry about it. The cancer could come back. So let's continue to treat the patient. I think that's very powerful evidence of turning a blind eye to the realities. The other half of the red flag evidence is equally revealing, I think, and it's that many of Glover Wing's nurses came to her and said that they went to visit the patients for in-home visits, and they couldn't find the patients. And the reason they couldn't find the patients, Your Honor, is because they were out grocery shopping. They were out picking up grandchildren from school. They were out running errands. There was testimony that these people were ambulatory, at least the three victims and many others, but for purposes of the sufficiency of those counts, you have patients who are ambulatory. They're out and living their lives. And Glover Wing, again, what we're saying about sort of honest providers, we want them to look into why these people are ambulatory if they've been diagnosed as terminal. She didn't do any of that. And I think all of that circumstantial evidence, that entire pool of evidence, and again, remember, as I know the Court does, we have to view the evidence in the light most favorable to the jury's verdict. And I think a rational jury, considering all of that evidence in light of the scheme, could readily have found that she intended, she acted with the requisite intent to defraud. And I would just also emphasize, I know the Court will look at it, but in its post-verdict order, where the district court found the evidence sufficient, it went through a lengthy discussion beginning at 430 of the record and going until 437 or 438. But the district court, this is the opening paragraph, the court finds sufficient evidence presented at trial to show that Glover Wing acted knowingly and with the specific intent to defraud the Medicare program. The government presented overwhelming evidence that Glover Wing orchestrated a scheme whereby numerous patients were certified for hospice care despite being ineligible for those services. I think the district court did a copious job reviewing the evidence. I know that the Court will as well. And obviously, it's a de novo review, but you still do have the benefit of the district court's thinking on the issue. I think just the final observation that I want to say on the sufficiency point is a lot of my distinguished colleagues' argument this morning resonated with my ear as being sort of more properly directed to the jury, talking about how there was two to one on the experts. And I think at one point he said that the evidence of fraudulent intent was ambiguous. But that's the whole point. The jury heard that evidence, and for purposes of evidentiary sufficiency review, this Court has to assume, view that evidence in the light most favorable. So that's the point. I don't think that any ambiguity or any conflict between the testimony of the experts, that's not the problems of this Court on a sufficiency review. Unless the Court has any further questions for me on any of the issues in this case, I'm happy to cede back the balance of my time. Thank you very much, Your Honor. Mr. Averly, you have four minutes of rebuttal time. The first point I want to make is it is true that the discussion of there being no undecided co-conspirators did come up during a discussion that was limited to co-conspirator hearsay. But the statement was unequivocal. The statement saying, well, we're not going to use this because there are no undecided co-conspirators, that is an unequivocal statement. It is not bound by the proceeding in which it arose. And in addition, they did tell the jury several times that there are, essentially there are no undecided co-conspirators. As far as the Court adopting the government's first position, there's plenty of language discussing the requirements for judicial estoppel. And they all talk about how there's no set rules. You're going to have to look at the particular case in which it arises. And in this case, you know, we think that the judge's, district court judge's acceptance of their position derives from the fact that the judge, just like the defense attorneys, was part of the audience every time that representation was made. And the judge didn't get up and say, no, you can't do that. Well, that should satisfy in this case, should you find the other elements. Regarding end-stage, you know, end-stage was lupus, stenosis, et cetera, COPD. There was evidence that those diagnoses are not sufficient for hospice determinations. But two things about that. Number one is, that's what they submitted. And those are rejected for that reason. So they're not hiding it. Well, Medicare says, well, but you've got to tell me what, you know, there's plenty of evidence that says lupus can cause. Counsel, let me ask you, in terms of the defense that was presented at trial, was there any evidence of your client either rejecting referred patients or being proactive in terms of saying, hey, this patient was certified, but now we have some doubts. I guess I'm responding to counsel's remark about a change in position where your client would have reported a change that would take the client, the patient out of your client's care. Yeah. I'm not sure. The one that the government points to is a nurse concerned about a patient who had cancer. And she said, well, she should remain in hospice because the cancer couldn't return. That certainly raises some questions. But then again, you know, that patient wasn't one of the substantive accounts. If that's evidence of anything, it has to be evidence of conspiracy. And you still need someone that she conspired with with respect to that conduct. And we don't think that they presented any such evidence. And the only other thing, I mean, you know, related to that is the, you know, patients that were out shopping. I personally have known people who had cancer and, you know, were shopping the week before they died. But again, where's the person with whom she conspired? All right. Thank you, Mr. Averill. Thank you. We know you're court appointed, and we appreciate your service to your client here before this court today. Counsel, your case will be considered submitted today. Thank you for your argument and for your excellent briefing.